Now we come to Stan Lee Media v. Conan Sales Company. It involves Conan the Barbarian. Don't fall asleep. Is that who you guys are? Which one of you is Conan? Which one of you is the Barbarian? All right. All right, Arnold. You're not Arnold, are you? No, Your Honor. You're Clark Kent, huh? Perhaps in the future they'll call me. Okay. My name is Luke McGrath. May it please the Court, I represent Stan Lee Media, Inc. And I'd like to start to focus the Court on two items that we believe are dispositive with regard to the appeal before you. Item number one, very simple. The appealed from order does not mention claims two through seven of our complaint. Not mentioned at all, yet the entire case was dismissed based upon a ruling on a Rule 60B application. I thought your lawyer, you were not counsel in the district court, or were you? Yes, I was. Okay, I thought you agreed with the judge when he said, look, I want to convert this into a Rule 60 motion, and either the case stands or falls on whether or not I set aside the judgment, and you agreed to that. So why didn't that resolve all the claims in the case when he ruled against you? Your Honor, we quote the transcript a few times in our papers, and that's not what the transcript says exactly. I mean, we can read the transcript. Let's assume for the sake of my question that you had agreed to the procedure that the district court proposed. Why didn't that ruling dispose of the entire case? Because the ruling is actually silent with regard to that. If the Court wanted to rule on the entire case in that manner and quote the transcript and say this was agreed to by the parties, the Court could have, but the Court didn't. We believe this is an error. Well, as I understand the district court's reasoning, and it makes sense to me, you are bringing claims which can only go forward if the judgment is set aside. And if the Court refuses to set aside the judgment, you've got no lawsuit. You have no claims to file. Well, I assume I would disagree with that for this argument. Tell me why I'm wrong to think that. Sure. I am a fiduciary, and I enter into a transaction, and that transaction is approved. But it turns out that I've had a conflict of interest, and I breached my fiduciary duties in entering into that arrangement, that settlement, that transaction. There's a breach of fiduciary duty claim that the corporation can bring against me whether or not the transaction is set aside. But before you can go forward with your claim, which is now, what, more than 10 years old, you're going to have to set aside that settlement, are you not, on that ground, that it was procured by fraud, by breach of fiduciary duty, whatever the equitable reason would be to justify the Court undoing the deal, it's got to be done first before you can then proceed with your claim. Your Honor, we would disagree with that because if the deal is not undone, if the settlement is not undone, there's still the damage to the corporation, and the corporation can demonstrate that the damage was caused by the faithless servant. The damage to the corporation. I mean, one way to view the transaction was that the bankruptcy court permitted a secured creditor, and your client was in default on the deal, to execute on the security, which it was entitled to do under the terms of the original purchase and sale transaction, and therefore, the only thing that happened in the bankruptcy proceeding was a secured creditor received its collateral that was securing the obligation of the debtor. And therefore, it wasn't an asset of the bankrupt estate. It was property that, in law, belonged to the creditor. That is certainly the defendant's position. Why isn't that true as a matter of law? How is this any different from permitting an adversary action to go forward involving a bank that has a security interest in a mortgage that the debtor has? Because the transaction, although argued by opposing counsel, is that secured interest transaction, that in reality, it would not be in bankruptcy law. It would still be a transfer that would be subject to the automatic stay, that the creditor would not be secured and would be in the back of the line just like the other unsecured creditors. Isn't the procedural history here that the bankruptcy court lifted the automatic stay at the request of the secured creditor, permitted the filing of an adversary action so that the creditor could execute on its security interest, and the settlement settled that claim? And that's the settlement that you wanted the district court 10 years later to unwind. Have I missed something in the procedural history of this case? That's how I understood the record. Right. In the procedural history, you're hitting the points, but we would disagree with the characterization of how the proceeding went. In a situation in bankruptcy law. of the procedural history of this bankruptcy case. I would not say that you went awry, Your Honor, but I would say that this is a disguised sale. What am I missing? This is a disguised sale, as often occurs in bankruptcy when there are interested parties and insiders who want to take an asset out of the bankruptcy. The one means of attack, one means to get around the automatic stay, is they bring an action, and then they characterize what is ultimately a sale as a settlement. But you're arguing in circles here, counsel. We're back to the same question I asked you at the beginning. Don't you first have to get the district court to set aside the settlement before you can bring that claim? And I think the answer is yes. So when the district court said, I'm going to treat this whole thing as a Rule 60 motion to lift the stay, shouldn't we do that first, and then assuming that he had granted you relief, then presumably you could have gone forward with these claims. But without the lifting or without the vacating of the prior settlement and the reopening of the bankruptcy case, you've got nothing to proceed against. Your Honor, I think we're at a point where the position is in the papers, and our position would be that would not be the case, but I understand what the court is saying, and I think we should maybe turn to answering questions about why the 60B motion should have been granted. I mean, you've got two minutes and 48 seconds. Spend it any time you want, counsel. I would actually like to reserve two minutes for rebuttal, and so I'll move very quickly to one of the main factual points, and this is at we believe that this case really follows the intermagnetics case law, and one thing that I want to draw the court's attention to is that Junko Kobayashi, who was supposed to be the designated or authorized representative of the debtors and looking out for the debtors' interests, was being compensated by the Lieberman-Conan Sales Corp. entities, and that's found at Record 354, and that's Ken Williams, who is the CEO of SLMI, who left and left the company without an authorized representative in January 2002. He states in a deposition that Junko Kobayashi was being paid by Conan to look after the Conan interests. So we have inside baseball in this transaction pretty much from day one. You have Junko Kobayashi, who is not authorized according to our position, who's looking after both the Conan sales interests and apparently the SLMI interests, and there's no disclosure to the court about this. There's no disclosure that there is waiting in the wings a seller who, after this transaction happens and is approved by the bankruptcy court, we believe in error, the Conan sales group turns around and sells the same asset for more than $4 million, and that follows intermagnetics, and that gives the court the authority to set aside this transaction. What took you so long to challenge the transaction? The company, SLMI, was trapped in a corporate governance situation where the people who were benefiting from the faithless servants themselves were in charge of the company up until 2007, when the Colorado courts finally ruled that they should be displaced and a new board put in power. And six months after, six, seven months after the Colorado courts empowered the new board, my law firm was hired, and we pursued multiple claims, including this one. And I'd like to reserve 27 seconds for rebuttal. No, we'll give you a little. Don't worry. Good morning, Your Honors. May it please the Court. My name is Ira Matetsky. I represent FLE's Lieberman, Kobayashi, and Champion. First of all, we are absolutely in agreement that the second through seventh claims properly shouldn't be being discussed at all here today for two fundamental reasons. First, as Your Honor referenced, it was expressly agreed by everyone in the district court, including the judge and including Mr. McGrath as counsel for SLMI, that this would be treated as a Rule 60 motion. The judge said, isn't it clear that these claims can't go forward without Rule 60 relief? Everyone agreed. That's, I won't burden the Court by quoting, but that's all over the record. Even apart from that, the claims can't possibly go forward if Rule 60B relief isn't granted. The second count was for a declaration of who owns the Conan property. If the order isn't set aside, there's absolutely no question as to who owns the Conan property. The third claim is to set aside the transfer. If 60B relief isn't granted, the transfer is not being set aside. The fourth claim is for breach of fiduciary duty by entering that the insiders or the officers allegedly entered into the very transaction the Court had approved. It's clear from numerous cases cited in our brief for both the U.S. Supreme Court and this Court, such as Traveler's Identity and Valley National Bank on 54 of our brief, that you cannot collaterally attack a bankruptcy court order by suing a party for complying with that order. So these claims were going nowhere even apart from the fact that SLMI agreed with Judge Wilson that they couldn't proceed. So let me now turn to the Rule 60 aspect of the case. The standard that SLMI needs to meet in order to get relief on any of its Rule 60 theories is, as the Court is aware, very high. Under Rule 60b-4, which I think is their primary claim, they need to show that the judgment or order of the bankruptcy court entered, as Your Honor indicated, now 11 1⁄2 years ago is void. Not that it might have been infected by some procedural or technical error, but that it was void as a matter of law. And we don't believe they've come close to making that showing. Under Rule 60d-3, fraud on the court, this Court has recognized, other courts have recognized, that fraud on the court is an extraordinarily grave allegation to make. It's not an allegation that should be made routinely. SLMI has been rejected. SLMI's claim of fraud on the court in a similar case was rejected once before in the Second Circuit, in the Lee v. Marvel case in 471 Fed Appendix 14. The Second Circuit pointed out that fraud on the court needs to be almost, conduct so severe as to defile the legal system. We don't have that here. We have a routine dispute about disclosure. It's not a fraud on the court. And finally, under 60b-6, which is the sort of other or miscellaneous prong to Rule 60b, those claims need to be brought within a reasonable time. Under 60c-1, 10 or 11 years is not a reasonable time. Again, in Lee v. Marvel, this same appellant, SLMI, this same party, which brought a claim to set aside a quarter in that case that was five years old, and the Second Circuit pointed out SLMI did not seek to vacate this judgment until more than five years after final judgment, much shorter periods. But isn't Mr. McGrath's response to that, well, the old directors and officers would not be bringing or authorizing such a claim? They're the wrongdoers. And that is his response. I think our response to that response is, frankly, that if SLMI as an entity was not in a position to bring the claim, then anyone representing SLMI could have brought it derivatively. Moreover, even after SLMI was put, even after the current management of SLMI was put in, or the current directors in the summer of 2010, they still waited more than a year before filing the claim until, by pure coincidence, the very day the movie was opening in the theaters. We think that even within those four corners, there's unreasonable delay. And even apart from the fact for delay, they have not made the extraordinary showing necessary under 60B-6 or any other provision. Did the district court even have jurisdiction to enter these rulings or to entertain the action? The district court raised it. At the beginning of the December 5, 2011 hearing, Judge Wilson asked whether this matter belonged before him or whether it belonged in the bankruptcy court. SLMI urged that Judge Wilson keep the case. It involves the same bankruptcy as some other matters that are currently pending before Judge or were then currently pending before Judge Wilson. There was some discussion about the allocation of jurisdiction between the district court and the bankruptcy court, withdrawal of the reference and so forth, and it was agreed that Judge Wilson decided he would keep the case. Right, but parties can't stipulate to jurisdiction. That's true, Your Honor, but of course, the bankruptcy court, ever since Northern Pipeline, the bankruptcy court is an adjunct of the district court. The district court has jurisdiction over anything that could be brought into bankruptcy court. I think what we had here was in effect, you could call it a withdrawal of the reference or you could call it, and I think SLMI has characterized this as in effect an independent action under Rule 60B. Rule 60, one of the prongs of Rule 60 provides that the court, in addition to the traditional Rule 60 motion, does have authority to entertain an independent action to set aside a judgment. So whether you look at this as in effect a withdrawal of a reference or whether you looked at this as an independent action to set aside the judgment, we believe Judge Wilson did have jurisdiction over a bank. This was a bankruptcy case in the Central District of California. Having said that, if SLMI had prevailed, further proceedings in the bankruptcy court would have been required. You can't just reopen an order from a bankruptcy court that's 11 years old where the case itself was dismissed in 2006. You'd have to reopen the case. There would have been a lot of procedural issues as well as the substantive need to unwind the settlement, repay the money and so forth. But I'm straying from Your Honor's question. The answer is that I believe that Judge Wilson did have jurisdiction. When you talk about the bankruptcy court being an adjunct of the district court, what do you mean by that? I mean, is that in the statute? Yes, sir. Since the Supreme Court in Northern Pipeline held that the bankruptcy judges not having Article III life tenure could not exercise the judicial power of the United States, that judicial power had to reside somewhere. And so as a formal matter, all bankruptcy jurisdiction resides in the first instance, not in the bankruptcy courts but in the district courts. Now, of course, each district is promulgated the general order of reference that these things will in the ordinary course be determined by bankruptcy judges. But any district judge at any time for cause shown can exercise the bankruptcy jurisdiction for himself or herself. And in this case? Well, that's kind of a scary rule. Because we set up this whole new system to keep the bankruptcy judges away from the clutches of the district judges, you know, who many of them were beating up the bankruptcy judges. There are. I think I might be better off not responding to that except to say that this is the structure we have. And in this case, the bankruptcy judge who had handled this case had long since retired. That's correct. And in fact, that was a point with agreeing with Judge Wardlaw that we couldn't stipulate the jurisdiction that didn't exist. But that was a point that Mr. McGrath made. And that, frankly, I think was at some foundation that the judicial economy that would be saved by giving the matter to the bankruptcy court would not be saved in this instance because she retired. But then she came back to work. She came back for a time. But by this point, she was she was gone again. I'd like to if I can yield the last minute to Mr. Emanuel. She was available. That's what I'm saying. Not at this point in time, I don't believe, Your Honor. We're talking about December of 2011. I don't know. I mean, I know she came back because I know who she is. By this point in time, she was no longer sitting on either of her stints on the bankruptcy court. Well, I don't know. At this point in time, I'm going to ask this of you. Does any of the parties who are being sued here actually own the rights to the property rights to Conan Barbarian? I can speak to that, Your Honor. May it please the Court? My name is Sasha Emanuel, and I represent actually the current owners of the rights. Which are? Which are the Appellees, Paradox Entertainment, Incorporated, Paradox Entertainment, AB, Conan Properties International, and Conan LLC. Who really owns it? The property now, Your Honor, it's owned by Conan Properties International, LLC. And who owns? Conan Properties International is wholly owned by Paradox Entertainment, Incorporated. And who owns Paradox? Paradox is owned by Paradox Entertainment, AB. And who owns them? That's where it ends.  So it's a publicly traded company. No, I mean, I say that because, oh, you know, we have to report certain stock maybe that we bought. And I'm trying to remember the details. But it turned out that I didn't report the subsidiary of a subsidiary of a subsidiary of a plaintiff in a case. Well, the only publicly traded company is a publicly traded company in another country. So you don't know. You don't know who owns these things. No, I understand. It gets confusing. But the New York Times thought I should have spent a couple of days and figured it all out. Yeah, that's a difficult, that's a lot of investment. Your Honor, I just have a few just basic points to make. I'll be brief. I agree with Mike. Not that I know of. It was very early in his career. He might not have had that bargaining power. Right, right. Yeah, that's right, Your Honor. And I'm not sure what Schwarzenegger's involvement, if any, there is in, I don't think there is any sort of ownership interest. But I just had a few points to address. And again, I'll be brief. I do agree with my co-appellees regarding Claims 2 through 7. I think, I was at the hearing as well, Your Honor. And I recall that those claims were inextricably intertwined with the first claim. And that the judge, Wilson, believed that the first claim had to be set aside in order to proceed with Claims 2 through 7, which I thought was the correct way. And everyone was on the same page with respect to that. The other points I'd like to make with respect to my clients, Your Honor, is just the fact that they were bona fide purchasers. Was this $4 million sale, was that already set up? That's been done, Your Honor. The sale of the asset to my client was done, God, seven or eight years ago. And all the money was paid. And ever since my client purchased the asset, they've been exploiting the asset. They've registered numerous copyrights, numerous trademarks. They've engaged in litigation to protect the asset in this district, filed several lawsuits for copyright infringement, trademark infringement. They've entered into other agreements with third parties to make movies and to exploit the asset. And so one of the points I wanted to make was that my clients have relied on the validity of this bankruptcy court order for over a decade now. And that it would work, it would be extremely inequitable under the circumstances to hold that that order was void or to set aside that order. And just based on the fact that my clients had no involvement in the bankruptcy process and that they purchased the asset in good faith and paid $4 million for it, and that they've been exploiting it without any sort of challenge from the plaintiffs for 10 years. The other point I wanted to make, Your Honor, was just along the same lines, that there's a strong interest in the finality of a bankruptcy court judgment or a bankruptcy court order. And parties that purchase assets in reliance on an order, that strong presumption should hold true, and I think it should hold true in this particular case. I disagree with the appellants in the fact that I don't think this case is factually similar, even remotely factually similar to the Intermagnetics case. There's no evidence submitted that anyone colluded or engaged in any sort of a bidding scheme, as was the case in Intermagnetics. There were no affirmative misrepresentations made or even alleged to have been made in this case, whereas in the Intermagnetics case there were affirmative misrepresentations that were made to the bankruptcy court that the bankruptcy judge relied on in entering the order approving a sale. So this case is factually distinguishable from Intermagnetics. So just basically, Your Honor, those are the three points, just the bonafide purchaser for value, the fact that it would be extremely inequitable to set aside this order given my client's reliance on it for the last 10 years, and that there's a strong finality, there's a presumption and a strong finality in bankruptcy court orders. If Your Honors don't have any questions, then I'm through. All right. Thank you. I'll try to be brief. The main points that I'd like to hit here is the timeline. And this is based upon the record evidence. There are two depositions from the Paradox Group that are in the record. And Mr. Malenberg, at paragraph 17, record 196, says that he began negotiations for the purchase of the Conan asset in September 2001. The Conan transaction that was approved by the court was in March 2002. So many months before, when Conan was still owned by SLMI and part of the SLMI bankruptcy, the Paradox defendants were negotiating with whom? Well, they should have been negotiating with SLMI, which means that they had to be negotiating with the only people left standing there, Arthur Lieberman, Junko Kobayashi. That's assuming that SLMI had a right to dispose of the asset. But again, we're back to my problem. If the secured creditor has a security interest in that asset, which ultimately the court permitted it to recoup because your client defaulted on the purchase agreement, then there wasn't an asset for SLMI to try and sell to somebody else. It belonged to the secured creditor. I understand your interpretation. I mean, it's the difference between legal and equitable title, is it not? Yes, but it's also the difference between who do you call when you pick up the phone to say, I want to buy this asset out of bankruptcy? But your client had no power to sell it at that point. Your client was in bankruptcy. That's the case, but at that point, there could have been a workout. There could have been a negotiation. There could have been a settlement. According to all the evidence, the client had no money and could not possibly pay all of its creditors. At that point, we were getting to that situation, but $4 million would have changed that. There was enough in the potential sale to change what happened in the bankruptcy. And that corporate opportunity was robbed from SLMI. I thought SLMI owed the secured creditor something like $4.2 million that they never paid. They gave them stock that they represented was worth $4.2 million and then immediately went into bankruptcy, rendering the stock virtually worthless. That's the factual scenario. So how would the sale, unless it were for far more than $4 million, have generated any cash that would have gone to the unsecured creditors? It would have generated some cash. It did, $275,000 in cash, which is what was part of the settlement offer, which I understand from the record was used to pay expenses of administering the bankrupt estate. Including the payment, I assume, of lawyers and accounts? We believe that that is accurate. I think also Wild Brain, which is the creditor, was paid. There was nothing left over to pay the unsecured creditors. Right, but in that situation, when you have the last asset of the estate going out the door, now, it was in dispute. That is correct. It was in dispute because the Lieberman Group brought a claim to basically to attempt to put the asset in play. And the timing of all that. Weren't the negotiations conducted between independent counsel for the unsecured creditors and independent counsel for the creditor? The record is clear that that was going on. Okay, so what evidence do you have that Mr. Lieberman or Ms. Kobayashi somehow, is it Ms. or Mr. Kobayashi? It's Ms. Okay, that they somehow inappropriately interfered with those negotiations? Well, interference by omission. Junko Kobayashi, if she knew about this sale, should have informed the unsecured creditors committee. And Mr. Klausner, if he was undertaking that negotiation. That's the crux of our argument. Mr. Klausner, either he knew about the sale and he fell down and So what other prospective purchaser was lurking out there in the wings that was willing to offer far more? Your Honor, our statement is that the Paradox Group was waiting in the wings. Well, but they were the ones who paid $275,000 in cash and got their secured property back. No, Your Honor, they did not pay that. Wasn't $275,000 part of the settlement? Right, but the Paradox folks were in secret while that settlement was going on. That's the crux of our argument. The settlement was with the Conan group, the Arthur Lieberman group. They were like the vultures. They were waiting in the wings and they knew about the bankruptcy. Arthur Lieberman, who is an SLMI lawyer, IP lawyer, knew about them. Junko Kobayashi, who is working with Arthur Lieberman, knew about the Paradox folks and did not raise it with the court, did not raise it, as far as we know, with Klausner. Clearly, Conan Sales wanted to sell the Conan property, and they did sell it. They sold it to your client. Only your client entered into a secured arrangement and then defaulted by filing for bankruptcy, giving, at that point, Conan Sales the right to foreclose, which it would have had, but for the bankruptcy. So another arrangement was made so that the secured creditor would be made as whole as it could be. And secured creditors come first. Even if Conan Sales wanted to sell it to someone else after they got it back, they clearly had wanted to sell it before. Sold it to the wrong person, a person who couldn't pay for it. So now they wanted to sell it to someone who could pay for it. I don't see anything wrong with that. I have nothing further to add. A good script might be, Conan goes bankrupt. I've got to have the vultures. The vulture angle. I like the vulture angle. Thank you, Your Honor. May I just provide the citation of the rule I referred to to Judge Wardlaw? It's Rule 60D1, Your Honor. I'm sorry. What is that? The rule that I referenced in my colloquy with you authorizing an independent action under Rule 60 is Rule 60D1. 60D1. Thank you, and we'll call the next matter.
judges: Pregerson, Wardlaw, Tallman